[Civ. No. 67515. Second Dist., Div. One. Nov. 30, 1983.]

GOLETA VALLEY COMMUNITY HOSPITAL et al.,
Plaintiffs and Respondents, v.
DEPARTMENT OF HEALTH SERVICES, Defendant and Appellant.

Counsel

John K. Van de Kamp, Attorney General, Thomas E. Warriner, Assistant Attorney General, Anne S. Pressman and Louis Verdugo, Jr., Deputy Attorneys General, for Defendant and Appellant.

Weissburg & Aronson, Patric Hooper and Mark S. Windisch for Plaintiffs and Respondents.

Opinion

**SPENCER, P. J.—**

Introduction

Defendant State Department of Health Services (Department) appeals from an order granting the petition of plaintiff hospitals for a writ of mandate.

Procedural Background

In late 1981, defendant sent to each of the plaintiffs, 19 acute care hospitals, the following letter: "State regulations which reduce inpatient reimbursement for hospitals with an occupancy rate below 55% will become effective on October 1, 1981 (section 51537 of title 22, California Administrative Code). Based on the latest data available to us, your hospital has a licensed bed size of [], and an average annual occupancy rate of [%]. Using the fixed cost proportion of []%, calculated for your hospital using the section 51536 methodology, we have determined that your Medi-Cal interim reimbursement percentage of []% will be reduced to []%, to make interim payments approximate tentative/final settlement.

"If there are errors in the data noted above, please notify us by November 1, 1981. Otherwise we will assume the data are correct and adjust your interim payments as of December 1, 1981 to reflect the proposed reduction in your tentative settlement level . . . ."

Rather than submit corrections in the data on which defendant relied, plaintiffs each sought an administrative adjustment to the payment rate determined by application of the 55 percent bed-occupancy standard and thereafter sought an administrative appeal. Initially, defendant accepted the ad-

ministrative adjustment/appeal procedure as properly applicable to interim payment rate reductions. However, on January 15, 1982, Staff Attorney Steve K. Koyasko wrote to Chief Hearing Officer Floyd J. Lasley, Jr., construing the adjustment/appeal procedure as applicable only upon final settlement, in that the 55 percent bed-occupancy standard could not, by its terms, be applied as an adjustment except in the course of the final settlement process.

Following the rejection of their efforts to obtain administrative adjustments or appeals, plaintiffs filed suit seeking to invalidate the 55 percent bed-occupancy standard or, in the alternative, a writ of mandate to compel defendant to grant an administrative appeal hearing prior to applying the standard to any individual hospital. Thereafter, the trial court heard plaintiffs' petition for a writ of mandate. The petition was granted on April 28, 1982, whereupon the trial court commanded defendant: (1) to comply with applicable law by granting each hospital an administrative appeal to determine whether they qualify for relief from the 55 percent occupancy standard; (2) to refrain from reducing plaintiffs' respective interim payment rates pending completion of such appeals; (3) to restore to each plaintiff any sum previously withheld by defendant based upon the 55 percent occupancy standard; and (4) to refrain from reducing or otherwise adversely affecting each plaintiff's interim payment rate until a final audit of each hospital's cost report is completed.

## CONTENTIONS

### I

Defendant contends its interpretation that interim rate reductions based on title 22, California Administrative Code section 51537 are nonappealable is procedurally valid and constitutes a permissible departure from an earlier interpretation.

### II

Defendant further contends it was not the intent of Congress to require, and federal regulations do not require, that interim payment rate reductions be appealable.

### III

Defendant asserts the state plan amendment does not provide appeal rights in the face of an interim rate reduction.

## IV

Defendant also asserts that both the state plan amendment, with implementing regulations and applicable federal regulations provide authority for the application of the 55 percent bed-occupancy standard to reduce interim payment rates.

## V

Finally, defendant avers that the trial court erred in concluding plaintiffs could seek relief from the 55 percent bed-occupancy standard via an administrative appeal.

### DISCUSSION

## I

■ Defendant contends its interpretation that interim rate reductions based on title 22, California Administrative Code section 51537 are nonappealable is procedurally valid and constitutes a permissible departure from an earlier interpretation. While we agree with the latter contention, we cannot agree with the former.

As noted in *Weiss* v. *State Board of Equalization* (1953) 40 Cal.2d 772, 776-777 [256 P.2d 1]: "Like courts, agencies may overrule prior decision or practices and may initiate new policy or law through adjudication . . . . [D]eliberate change in or deviation from established administrative policy should be permitted so long as the action is not arbitrary or unreasonable." However, the power to overrule an earlier interpretation of an agency's regulations does not necessarily render the act of reinterpretation procedurally valid.

Administrative agency rulemaking is governed by the California Administrative Procedure Act, chapter 3.5 (Gov. Code, §§ 11340-11356). Government Code section 11342, subdivision (b), defines "regulation" as follows: "'Regulation' means every rule, regulation, order, or standard of general application or the amendment, supplement or revision of any such rule, regulation, order or standard adopted by any state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure, except one which relates only to the internal management of the state agency." Accordingly, a written interpretation of a rule or regulation which concerns a matter of import generally to those dealing with the interpreting agency cannot escape scrutiny on the ground

it does no more than govern the agency's internal affairs. (*Armistead* v. *State Personnel Board* (1978) 22 Cal.3d 198, 203 [149 Cal.Rptr. 1, 583 P.2d 744].)

Government Code section 11347.5 provides in pertinent part: "No state agency shall issue, utilize, enforce, or attempt to enforce any . . . regulation . . . unless [it] . . . has been adopted as a regulation and filed with the Secretary of State pursuant to this chapter." Any "regulation" promulgated contrary to the provisions of chapter 3.5 of the Administrative Procedures Act is invalid. (*Armistead* v. *State Personnel Board, supra,* 22 Cal.3d 198, 201.) It is undisputed that the written interpretation at issue herein was undertaken without any attempt at complying with the applicable Government Code provisions. Hence, the letter of January 15, 1982, interpreting the appeals provisions of the California Administrative Code, title 22 as inapplicable to interim payment rate reductions is procedurally invalid. Moreover, due to its invalidity, it merits no weight as an agency interpretation of a regulation. (*Id.,* at p. 205.)

## II

Defendant further contends it was not the intent of Congress to require, and federal regulations do not require, that interim payment rate reductions be appealable. Again, we cannot agree.

The resolution of this issue turns on the reasonable interpretation given the term "payment rates" as used in federal regulations applicable to Medicaid plans and the discernible intent of Congress in enacting section 2173 of Public Law No. 97-35 (42 U.S.C. § 1396a(13)(A)). The same rules of construction applicable to statutes govern the interpretation of administrative regulations. (*Smith* v. *Regents of University of California* (1976) 58 Cal.App.3d 397, 403 [130 Cal.Rptr. 118].) Hence, this court should attempt to ascertain the intent of the regulating agency. (*People* v. *McCaughan* (1957) 49 Cal.2d 409 [317 P.2d 974].) Further, in construing a regulation, we may consider other regulations which may shed light on the meaning of the regulation at issue. (*People* v. *Corey* (1978) 21 Cal.3d 738, 743 [147 Cal.Rptr. 639, 581 P.2d 644].) Indeed, similar regulations should be construed in light of one another, and similar phrases in each would be given like meanings. (*People* v. *Caudillo* (1978) 21 Cal.3d 562, 585 [146 Cal.Rptr. 859, 580 P.2d 274].)

Title 42 Code of Federal Regulations section 447.259 provides: "The [state] agency must provide an appeals procedure that allows individual providers an opportunity to submit additional evidence and request prompt

administrative review of payment rates." With reference to "payment rates," 42 Code of Federal Regulations section 447.252(a) provides: "The Medicaid agency must pay for inpatient hospital services and long-term care facility services through the use of rates that are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated providers to provide services in conformity with applicable . . . laws . . . ." In discussing the upper allowable limit on Medicaid payment, 42 Code of Federal Regulations section 447.272 makes reference to "the interim rate paid to the provider under Medicare . . . ."

Title 42 Code of Federal Regulations section 405.454 addresses interim payments. Subdivision (c) notes: "At the beginning of the program or when a provider first participates in the program, it will be necessary to establish interim rates of payment to providers of services. Once a provider has filed a cost report under the health insurance program, the cost report may be used as a basis for determining the interim rate of reimbursement for the following period. . . ." Subparagraph (4) of subdivision (c) states: "After the initial interim rate has been set, . . . the intermediary may adjust the interim rate of payment if it has evidence that actual costs may fall significantly below the computed rate." Subdivision (e) provides: "Interim rates of payment for services provided after the initial reporting period will be established on the basis of the cost report filed for the previous year covering health insurance services. The current rate will be determined—whether on a per diem or percentage of charge basis—using the previous year's costs of covered services and making any appropriate adjustments required to bring, as closely as possible, the current year's rate of interim payment into agreement with current year's costs. This interim rate of payment may be adjusted by the intermediary during an accounting period if the provider submits appropriate evidence that its actual costs are or will be significantly higher than the computed rate. Likewise, the intermediary may adjust the interim payment if it has evidence that actual costs may fall significantly below the computed rate."

An analysis and comparison of the language used in the above regulations reveals an interchangeable usage of the terms "payment rate," "rate of reimbursement," and "rate of payment" applicable equally to interim payments and final reimbursements. Hence, it appears clear from the content of similar regulations that the term "payment rate" is intended to encompass both. Moreover, this analysis is consistent with the principle underlying interim payments and with the intent of the Department of Health and Human Services in requiring an appeals procedure.

Title 42 Code of Federal Regulations section 405.454(a) states: "Providers of services will be paid the reasonable cost of services furnished to

beneficiaries. Interim payments approximating the actual costs of the provider will be made on the most expeditious basis administratively feasible . . . . A retroactive adjustment based on actual costs will be made at the end of the reporting period.'' Further, subdivision (b) provides in part: ''Whatever estimated cost basis is used for determining interim payments during the year, the intent is that the interim payments shall approximate actual costs as nearly as is practicable so that the retroactive adjustment based on actual costs will be as small as possible.'' Inasmuch as interim payments are intended to closely approximate the final reimbursements due to a care provider, it is only logical that the provider have an opportunity to challenge the payment rate applied as soon as possible.

The intent of the Department in providing an appeals procedure is expressed in the 46 Federal Register, No. 189 (Sept. 30, 1981), at page 47968: ''The revised regulations require each State agency to develop an appeals procedure that allows a provider to submit evidence to the agency and seek prompt administrative review of its payment rate. We believe the appeals requirement described above is needed because individual facility rates will not receive Federal review under the revised regulations.'' The lack of federal review applies equally to the determination of individual interim payment rates and to individual final reimbursement payment rates. Without an appeal process available to challenge changes in individual interim payment rates, providers could be left with significant shortfalls in daily operating funds due to the Department's actions. This is contrary to the principle underlying the concept of interim payments and to the legislative intent of Congress in affording the states greater flexibility. As noted in the Senate Budget Committee Report (Sen. Com. Rep., No. 97-139): ''The flexibility given the States is not intended to encourage arbitrary reductions in payment that would adversely affect the quality of care.'' A significant reduction in available daily operating revenues would have just such an effect. Therefore, consonant with the intent of the Department of Health and Human Services and the Legislature, it is reasonable to interpret the appeals requirement as applicable to interim payment rate changes.

III

In view of the conclusions we have reached, *ante,* we find it unnecessary to address defendant's assertion that the state plan amendment does not provide appeal rights in the face of an interim rate reduction. Insofar as the state plan amendment is inconsistent with federal requirements, it is invalid. (See *California Hosp. Ass'n.* v. *Schweiker* (C.D.Cal. 1982) 559 F.Supp. 110 [affd. 705 F.2d 466].)

## IV

■ Defendant also asserts that both the state plan amendment, with implementing regulations, and applicable federal regulations provide authority for the application of the 55 percent bed-occupancy standard to reduce interim payment rates. We perceive no merit to this assertion.

Title 22, California Administrative Code, makes a clear distinction (with respect to Medi-Cal payments) between "reimbursement" and "interim payments." Section 51536, subdivision (a) states: "[r]eimbursement for hospital inpatient services provided to Medi-Cal program beneficiaries shall be the lesser of the following for each hospital: [¶] (1) Customary charges. [¶] (2) Allowable costs determined in accordance with applicable Medicare standards and principles of reimbursement. [¶] (3) All-inclusive rate per discharge."

In turn, the state payment plan, as amended, provides in section I(C): "An all-inclusive rate per discharge will be established for services provided during the hospital's final settlement year. Each hospital's rate per discharge will be updated annually to reflect reimbursement changes. . . ." Section II defines "Final Settlement Year" as "The hospital accounting year for which final settlement is being concluded." With regard to payments, title 22, California Administrative Code section 51536, subdivision (c) further notes: "The methods of payment for inpatient hospital services shall include the following: [¶] (1) An all-inclusive rate per discharge that shall be retroactively established for each hospital's final settlement. . . . [¶] (2) An interim payment based upon a cost to charge ratio, as set forth in federal regulations." Hence, it is clear that the term "reimbursement" encompasses the term "all-inclusive rate per discharge" and both apply to after-the-fact payments. Interim payments are separately identified, and the terms are not intermixed.

Title 22, California Administrative Code section 51537, subdivision (a) provides: "Inpatient hospital reimbursement determined in accordance with Section 51536 shall be adjusted if a hospital's average annual bed occupancy rate is below 55 percent of the hospital's licensed bed capacity. The adjustment shall be made in accordance with the reimbursement level formula in (b)." The reimbursement level formula in section 51536, subdivision (b) cannot be utilized until the all-inclusive rate per discharge is established—an event which occurs in the process of final settlement. Therefore, the 55 percent bed-occupancy standard cannot be applied as an adjustment except in the course of the final settlement process. Indeed, the Department utilized

this analysis in its January 15, 1982, letter interpreting the administrative adjustment/appeal procedure as inapplicable to interim rate reductions.

Nevertheless, the Department relies on 42 Code of Federal Regulations section 405.454(e) as an authority for utilizing the standard to adjust interim rates during the accounting period at issue. As noted, *ante,* this section states: "This interim rate of payment may be adjusted by the intermediary during an accounting period . . . if it has evidence that actual costs may fall significantly below the computed rate." Unfortunately, the 55 percent bed-occupancy rate standard is not *evidence* of anything.

Any relevant evidence relating to a reduction in payment rate based on the occupancy rate would be evidence of a provider's current (accounting period) average annual occupancy rate. Yet the record reveals that the Department relied on no new evidence whatsoever; it applied past data, long known to it, to the new *standard.* In other words, the Department applied the 55 percent bed-occupancy rate requirement as a *new evidentiary standard* by which to measure past data for the purpose of adjusting interim rates. Section 405.454(e) provides no authority for an adjustment made on such a basis, nor does any other federal regulation. In the absence of either federal or state authority permitting the application of the new bed-occupancy rate standard at the interim payment level, the trial court properly enjoined such application.

## V

Finally, defendant avers that the trial court erred in concluding plaintiffs could seek relief from the 55 percent bed-occupancy standard via an administrative appeal. While we agree that the bare fact a care provider services a disproportionate share of Medicaid recipients would not per se entitle a provider to an exemption from the occupancy standard, we cannot agree that no species of relief is therefore available.

Section V, paragraph A, subdivision 2 of the state plan amendment provides: "The following items may be resolved through an administrative adjustment: a. The addition of new and necessary services. b. Changes in case mix. c. Inappropriate calculation of fixed and variable costs. d. Proportionate reduction in reimbursement for underutilized bed capacity. e. Other items affecting hospital costs." Similarly, title 22, California Administrative Code section 51536(h)(3)(B)1 permits a request for an administrative adjustment on the following bases: "1. Costs for which additional reimbursement is being requested are necessary, proper, and consistent with efficient and economical delivery of covered patient care services. [¶] 2.

Incorrect data were used. [¶] 3. An error was made in the rate calculation. [¶] More appropriate data are available." Both section 51536 and the state plan amendment suggest a broad spectrum of bases upon which a care provider could seek relief from the 55 percent occupancy standard.

"Relief" is not necessarily synonymous with exemption. There are many ways in which a care provider could demonstrate that a different rate of reduction should be applied or that the facility was no longer subject to a rate reduction under the bed-occupancy standard. In addition, although not creating an exemption per se, the impact and relation of providing service to a disproportionate number of Medi-Cal recipients on the bed-occupancy rate and overall hospital costs, as well as any potential for a significant diminution in the quantity and quality of care available to Medi-Cal beneficiaries should the bed-occupancy standard blindly be applied, are entitled to careful consideration. For example, it may be that certain costs should not be deemed "fixed" but should be attributed to the disproportionate number of Medi-Cal recipients served.

In summary, the administrative adjustment/appeal procedure provides sufficient flexibility to permit the consideration of all potentially relevant factors prior to reducing a care provider's payment rate. Therefore, the trial court did not err in requiring defendant to make available to care providers the adjustment/appeal procedure before undertaking rate reductions by application of the 55 percent bed-occupancy standard.

The order is affirmed.

Lillie, J., and Hanson (Thaxton), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 25, 1984.