Filed 8/17/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ST. JOHN OF GOD RETIREMENT & CARE CENTER, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> DEPARTMENT OF HEALTH CARE SERVICES OFFICE, <br><br> Defendant and Respondent; <br><br> GLORIA GLOVER-WOODS, <br><br> Intervenor and Respondent. | B265488 <br><br> (Los Angeles County <br> Super. Ct. No. BS148766) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Luis A. Lavin, Judge.  Reversed as moot.

Foley & Mansfield, Noelle M. Natoli-Duffy, M. Amadea Groseclose and Melanie A. Ayerh for Plaintiff and Appellant.

Kevin P. Kane & Associates, Inc., and Kevin P. Kane; BraunHagey & Borden and Matthew Borden for Intervenor and Respondent.

Gloria Glover Woods was a resident of St. John of God Retirement & Care Center (St. John), a skilled nursing facility in Los Angeles, who elected hospice care through a provider under contract to the facility. When Ms. Woods experienced a psychotic episode, the hospice provider directed that she be transferred from St. John to an acute care hospital for evaluation and treatment. When her treatment was concluded, St. John refused to readmit her to the first available bed under 42 Federal Code of Regulations, section 483.12 (section 483.12), which governs the requirements for a skilled nursing facility's involuntary transfer or discharge of a resident. After an administrative hearing, the Department of Health Care Services (DHCS) ordered St. John to readmit Ms. Woods. The superior court denied St. John's petition for writ of administrative mandate seeking to vacate the order, and St. John appeals.

We conclude that in light of developments during the pendency of the appeal, the order requiring Ms. Woods' readmission is now moot. However, because there is a separate civil lawsuit between the parties in which the issue is likely to arise again, we exercise our discretion to decide whether section 483.12 exempts a skilled nursing facility from the readmission requirement (§ 483.12, subd. (b)(3)) when the transfer to an acute care hospital from which the resident is returning was ordered by the resident's hospice care provider rather than the facility itself. We conclude that section 483.12 contains no such exemption. Thus, to the extent St. John contends that its refusal to readmit Ms. Woods did not constitute an involuntary transfer because she was returning from an acute hospitalization ordered by her hospice care provider, and that therefore St. John was not bound by the involuntary transfer requirements of section 483.12, subdivisions (a)(2) (identification of a justifying circumstance), (a)(3) (documentation of the justifying circumstance), and (a)(7) (preparation and

2

orientation for a safe and orderly transfer, including giving notice of the effective date of the transfer or discharge and the new resident location (subds. (a)(6)(ii) and (iii)), St. John is mistaken. We also reject St. John's contention that readmitting Ms. Woods and thereafter discharging her after complying with section 483.12's requirements would have subjected St. John to liability under Health and Safety Code section 1432.

We decline to resolve any other issues raised by the parties, as the resolution of those issues (to the extent they might arise again) is better suited to the separate civil litigation. Because the DHCS order directing readmission is moot, we reverse the trial court's order denying the writ of administrative mandate solely for purpose of remanding the case with directions to dismiss the administrative mandate proceeding as moot.[1]

## BACKGROUND

We summarize the proceedings prior to the filing of the notice of appeal. We leave to our Discussion section later developments regarding the issue of mootness.

*Admission to St. John*

On September 19, 2013, Ms. Woods (then 72) was admitted to St. John. Based on records from her former hospice facility in Georgia, St. John admitted

---

[1] ""'"Where an appeal is disposed of upon the ground of mootness and without reaching the merits, in order to avoid ambiguity, the preferable procedure is to reverse the judgment with directions to the trial court to dismiss the action for having become moot prior to its final determination on appeal. [Citations.]" [Citations.]' [Citation.]" (*Giles v. Horn* (2002) 100 Cal.App.4th 206, 229 (*Giles*).)

3

her with a diagnosis of amyloidosis, hypertension, anxiety, hypothyroidism, and psychosis.

Ms. Woods' daughter, Mikko Boutte-Evans, informed St. John that Ms. Woods was terminally ill and wanted to be with her mother, who also was a resident at St. John. According to Norma Bullen, Director of Nursing at St. John, she admitted Ms. Woods, despite the diagnosis of psychosis, because she saw no records suggesting that Ms. Woods manifested psychotic behavior, and because "when you are dying, you're dying, and how much more can she be a potential danger to staff and to the other residents." Ms. Bullen placed Ms. Woods in the same room with her mother.

*Hospice Care*

On December 10, 2013, St. Liz Hospice, Inc. (St. Liz) evaluated Ms. Woods. Pursuant to her authority as Ms. Woods' Durable Power of Attorney, Ms. Boutte-Evans executed documents consenting to Ms. Woods receiving hospice care from St. Liz while residing at St. John, including an acknowledgement that "Inpatient Care will be provided by St. Liz Hospice, Inc. for pain control, symptom management, and management of psycho-social problems related to my terminal illness. I understand that this care will be provided at a facility contracted with St. Liz Hospice, Inc. [referring to St. John]." She also acknowledged that St. Liz would arrange any hospital outpatient treatment that might be required, and that "[h]ospitalization may be required for certain procedures or care, and these will be arranged through a contracted facility of the hospice."

*Hospitalization*

Until March 2014, Ms. Woods was cooperative while residing at St. John, though at times she seemed confused. However, beginning in March 2014, she began displaying threatening and disruptive behavior, which included (according to Ms. Bullen) choking two nurses, trying to strike another, and throwing a snow globe at yet another (it broke against the wall). For the safety of other residents, Ms. Woods was transferred to a single room.

In April 2014, an evaluator from the California Department of Health Care Services performed a mental health evaluation on Ms. Woods – a level II Preadmission Screening and Resident Review (PASRR). In the course of the evaluation, Ms. Woods reported that she had been raped at St. John. When St. John asked Ms. Boutte-Evans about the report, she said that she had heard about it from Ms. Woods' mother (Ms. Boutte-Evans' grandmother), and that Ms. Woods was hallucinating.

On April 10, 2014, based on Ms. Woods' behavior and rape report, the St. Liz attending physician ordered Ms. Woods transferred to Brotman Medical Center (Hospital) for a psychiatric evaluation and management of her condition.

*Refusal of Readmission*

On April 21, 2014, St. John received an inquiry from the Hospital about readmitting Ms. Woods. St. John refused readmission on the ground that it could not provide the specialized services recommended in Ms. Woods' PASRR level II evaluation, which included a behavior modification program to reduce incidents of aggression and yelling, individual psychotherapy, and mental health rehabilitation activities.

*Ombudsman Appeal*

On April 30, 2014, a representative of the Office of California State Long-Term Care Ombudsman (Ombudsman) filed an appeal and complaint on Ms. Woods' behalf with the Department of Health Care Services Hearing and Appeals Unit. The complaint alleged that St. John's refusal to readmit Ms. Woods constituted an improper discharge from the facility. The complaint also alleged that St. John failed to honor the seven-day bed hold required by California law.

*Administrative Hearing*

On May 6, 2014, the ombudsman's appeal went to an administrative hearing before a DHCS hearing officer with the Office of Administrative Hearings and Appeals Transfer/Discharge and Refusal to Readmit Unit. Present at the hearing on behalf of Ms. Woods were Ms. Woods herself, the ombudsman, and Ms. Boutte-Evans. Present on behalf of St. John were J.P. Cosico (St. John's Administrator), Norma Bullen (Director of Nursing), Catherine Penlocky (RN Supervisor), and Dao Truong (the caseworker). Also present was Dr. Pontaya Fahardee (Ms. Woods' treating psychiatrist at the Hospital).

Neither side was represented by counsel, and the hearing was informal. Although the participants' testimony was given under oath and subject to cross-examination, the hearing officer conducted much of the questioning and the testimony was elicited in conversational form.[2] The hearing officer also received documentary evidence.

---

[2]    The applicable rules of procedure for such a hearing are set forth in 34 Code of Federal Regulations section 222.156:

"Administrative hearings under this subpart are conducted as follows:

"(a)  The administrative hearing is conducted by an ALJ appointed under 5 U.S.C. 3105, who issues rules of procedure that are proper and not inconsistent with this subpart.

6

On May 13, 2014, the hearing officer issued her written Decision and Order. She reasoned that St. John failed to comply with its duty under section 483.12, subdivision (b), and Title 22, California Code of Regulations, section 72520, subdivision (b), (section 72520) to give written notice of Ms. Woods' right to a seven-day bed hold under California law. Nonetheless, the evidence showed that St. John did, in fact, keep the bed open for that period. Also, the bed hold requirement does not apply if the facility is notified in writing that the patient's stay will exceed seven days. Because Ms. Woods' stay ultimately exceeded seven days, and because St. John held a bed open for seven days, the hearing officer deemed the failure to give notice of the required seven-day bed-hold moot.

However, the hearing officer concluded that St. John violated the next-available-bed requirement of federal law. Section 483.12, subdivision (b)(3), requires a skilled nursing facility to establish and follow a policy that permits a resident whose acute hospitalization exceeds the State bed-hold period to be readmitted to the first available bed if the resident requires the facility's services

<hr>

"(b) The parties may introduce all relevant evidence on the issues stated in the applicant's request for hearing or on other issues determined by the ALJ during the proceeding. The application in question and all amendments and exhibits must be made part of the hearing record.

"(c) Technical rules of evidence, including the Federal Rules of Evidence, do not apply to hearings conducted under this subpart, but the ALJ may apply rules designed to assure production of the most credible evidence available, including allowing the cross-examination of witnesses.

"(d) Each party may examine all documents and other evidence offered or accepted for the record, and may have the opportunity to refute facts and arguments advanced on either side of the issues.

"(e) A transcript must be made of the oral evidence unless the parties agree otherwise.

"(f) Each party may be represented by counsel.

"(g) The ALJ is bound by all applicable statutes and regulations and may neither waive them nor rule them invalid."

and is Medicare eligible. The hearing officer concluded that St. John's refusal to readmit Ms. Woods to the first available bed when informed by the Hospital she was ready for transfer constituted an improper, involuntary transfer or discharge under federal law.

The hearing officer reasoned: "In general, a facility should readmit a resident pending the resolution of the transfer/discharge process and initiate a more permanent move after it identifies a more appropriate facility. [¶] While this tribunal is mindful of the challenges that resident's care may present, a SNF [skilled nursing facility] may not use hospitalization as a mechanism to circumvent the aforementioned involuntary transfer/discharge requirements. Hospitalization is for the purpose of evaluation and treatment of an acute condition. Resident is no longer in need of acute psychiatric or medical treatment and return to facility . . . is appropriate, as supported by the federal regulations. [¶] If facility believes that a transfer/discharge is necessary for resident's welfare or that her behavior jeopardizes the safety of herself or others, then the regulations provide a remedy under 42, C.F.R. section 483.12, subdivision (a) et seq., which sets forth a number of requirements, including proper discharge planning. [¶] [F]acility failed to support that it complied with this requirement."

On this reasoning, the hearing officer concluded that St. John improperly refused to readmit Ms. Woods, and ordered that St. John "MUST [*sic*] immediately offer to readmit [her] to the first available female bed in a semi-private room."

*Administrative Mandate*

St. John filed a petition for writ of administrative mandate in the superior court seeking to overturn the hearing officer's ruling. The Department of Health Care Services, whose hearing officer conducted the administrative hearing,

8

declined to participate in the matter. The superior court granted Ms. Woods' motion to intervene in the writ proceeding, and also granted permission to file a separate civil complaint in intervention alleging various causes of action, including breach of contract and financial abuse of an elder. In the civil case (Los Angeles Superior Court case No. BC556147), among other allegations, Ms. Woods relies in part on St. John's alleged failure to comply with the requirements for an involuntary transfer under section 483.12, subdivision (a), et seq., and incorporated an attached copy of the hearing officer's decision. The superior court stayed action on the civil complaint in intervention pending determination of the petition for writ of administrative mandate.[3]

In its briefing in support of its petition for writ of administrative mandate in the trial court, St. John argued that the hearing officer erred in concluding that it violated section 483.12. In relevant part, St. John noted that although Ms. Woods resided at St. John, the order to transfer her to the Hospital was made by St. Liz, thereby, according to St. John, absolving St. John of its duty to readmit. St. John also argued that even if it was responsible for the transfer, the hearing officer abused her discretion in ordering that Ms. Woods be re-admitted, because St. John could not meet her specialized psychiatric needs (see Cal. Code Regs., tit. 22, § 72515, subd. (b) ["The licensee shall: [¶] . . . [¶] [a]ccept and retain only those patients for whom it can provide adequate care"].) Finally, St. John accused the hearing officer of being biased against it.

Following hearing, the trial court issued a lengthy minute order denying St. John's petition, and St. John appeals.

---

[3] However, as we explain in our discussion of the mootness issue, based on the parties' representations in their briefs, discovery in that case is ongoing.

9

## DISCUSSION

### I. *Mootness*

St. John contends that events subsequent to the filing of the appeal render the order requiring that Ms. Woods be offered the first available bed moot. The contention depends on facts outside the record on appeal, but which are conceded by Ms. Woods.

In its opening brief, St. John states that "Ms. Woods' counsel will likely stipulate to" the following facts: there is no evidence that Ms. Woods still lives in California, that she is currently receiving or in need of skilled nursing care, or that she intends to return to St. John. In response, in her respondent's brief, apparently based on discovery that has occurred in the separate civil lawsuit, Ms. Woods concedes the following facts (we delete the argumentative language of the brief): "In this case . . . , after 40 . . . days in the hospital, respondent found another nursing home in California, where she lived . . . for 14 months. In steadily declining health, . . . respondent chose to move again in late August 2015, this time to her daughter's home in New Jersey. . . . On October 2, 2015, . . . against medical advice . . . , respondent took an unaccompanied flight from Newark to Los Angeles, went directly to appellant's nursing home to see her mother, and then went directly to Cedars Sinai with complaints of severe chest pains. Released from the hospital on October 6, 2015, respondent gave her deposition in the related case (BC556147) on October 8, 2015, and then returned directly to her mother's bedside at appellant's nursing home. Respondent was still there when her mother passed away on October 10, 2015. Respondent now resides in her daughter's home in New Jersey." Ms. Woods concedes that her mother's death resulted in the "end to [her] desire for re-admittance to" St. John.

10

On these conceded facts, the specific order issued by the hearing officer – that St. John "immediately offer to readmit [Ms. Woods] to the first available female bed in a semi-private room" – is moot. "'It is well settled that an appellate court will decide only actual controversies and that a live appeal may be rendered moot by events occurring after the notice of appeal was filed. We will not render opinions on moot questions or abstract propositions, or declare principles of law which cannot affect the matter at issue on appeal.' [Citations.] [¶] The general rule regarding mootness, however, is tempered by the court's discretionary authority to decide moot issues." (*Building a Better Redondo, Inc. v. City of Redondo Beach* (2012) 203 Cal.App.4th 852, 866-867.)

Here, the record demonstrates that Ms. Woods' motivating reason for wishing to reside at St. John was to be near her mother, who also resided there. As Ms. Woods now concedes, her mother has passed away, and Ms. Woods no longer wishes to return. Ms. Woods no longer lives in California, but rather in New Jersey at her daughter's home. Given these facts, the order to offer re-admittance can provide no effective relief, because Ms. Woods will not accept re-admittance.

However, even "if an appeal is technically moot, [when] 'there may be a recurrence of the same controversy between the parties and the parties have fully litigated the issues,' a reviewing court may in its discretion reach the merits of the appeal. [Citation.]" (See *City of Hollister v. Monterey Ins. Co.* (2008) 165 Cal.App.4th 455, 480.) Here, Ms. Woods contends that there is a likelihood that the same controversy regarding St. John's refusal to readmit her will arise again, because she still has a separate civil complaint for damages against St. John. As we have noted, in the civil case, Ms. Woods relies in part on St. John's alleged failure to comply with the requirements for an involuntary transfer under section 483.12, subdivision (a), et seq., and incorporated in her complaint an attached copy

11

of the hearing officer's decision. In arguing that it did not violate section 483.12, St. John has raised an issue of law, requiring an interpretation of section 483.12. St. John contends that under the plain meaning of section 483.12, it was not bound by the first-available-bed requirement, because Ms. Woods was under the care of her hospice provider (St. Liz) while residing at St. John, and because a St. Liz physician directed her transfer to the Hospital. We exercise our discretion to review this issue, because it is likely to be a key legal issue in the pending civil case, and because the parties have briefed it both in the trial court and on appeal. We decline to consider any other issues on appeal, which can be better handled through discovery and litigation in the civil case.

II. *First Available Bed Requirement – Right of Return*

A. *Relevant Provisions*

In construing the meaning of section 483.12 (a Medicare administrative regulation), we use the same rules applicable to the interpretation of statutes. "Hence, this court should attempt to ascertain the intent of the regulating agency. [Citation.] Further, in construing a regulation, we may consider other regulations which may shed light on the meaning of the regulation at issue. [Citation.] Indeed, similar regulations should be construed in light of one another, and similar phrases in each would be given like meanings. [Citation.]" (*Goleta Valley Community Hospital v. Department of Health Services* (1983) 149 Cal.App.3d 1124, 1129.)

In order to place the issue we shall decide in proper context, we must begin by summarizing the relevant provisions: section 483.12, which governs a skilled nursing facility's involuntary transfer or discharge of a resident; section 72520, which governs California's bed-hold policy; and Health and Safety Code section

12

1599.1, subdivisions (h)(1) and (h)(2), which specify the appeal rights of a long-term care resident who is denied readmission in violation of section 483.12.

1. *Transfer and Discharge*

Subdivision (a)(1) of section 483.12 defines the terms "[t]ransfer and discharge." It provides: "Transfer and discharge includes movement of a resident to a bed outside of the certified facility whether that bed is in the same physical plant or not. Transfer and discharge does not refer to movement of a resident to a bed within the same certified facility."

2. *Resident's Right to Remain in the Facility*

Section 483.12, subdivision (a)(2) governs the requirements for an involuntary transfer or discharge, meaning one in which the facility transfers or discharges a resident under circumstances that overcome the resident's right to remain in the facility. It provides, as here relevant: "The facility must permit each resident to remain in the facility, and not transfer or discharge the resident from the facility unless – [¶] (i) The transfer or discharge is necessary for the resident's welfare and the resident's needs cannot be met in the facility; [¶] [or] [¶] . . . (iii) The safety of individuals in the facility is endangered."[4]

---

[4] Section 483.12, subdivision (a)(2) provides in full:
"Transfer and discharge requirements. The facility must permit each resident to remain in the facility, and not transfer or discharge the resident from the facility unless –
"(i) The transfer or discharge is necessary for the resident's welfare and the resident's needs cannot be met in the facility;
"(ii) The transfer or discharge is appropriate because the resident's health has improved sufficiently so the resident no longer needs the services provided by the facility;
"(iii) The safety of individuals in the facility is endangered;
"(iv) The health of individuals in the facility would otherwise be endangered;

13

### 3. *Documentation for Transfer or Discharge*

Section 483.12, subdivision (a)(3) specifies the documentary procedure necessary for a facility to implement such a transfer or discharge of a resident: "When the facility transfers or discharges a resident under any of the circumstances specified in paragraphs (a)(2)(i) through (v) of this section, the resident's clinical record must be documented. The documentation must be made by – [¶] (i) The resident's physician when transfer or discharge is necessary under paragraph (a)(2)(i) or paragraph (a)(2)(ii) of this section; and [¶] (ii) A physician when transfer or discharge is necessary under paragraph (a)(2)(iv) of this section."

### 4. *Transfer and Discharge Planning*

Section 483.12, subdivision (a)(7) requires, in substance, that the facility provide a plan for transfer or discharge: "Orientation for transfer or discharge. A facility must provide sufficient preparation and orientation to residents to ensure safe and orderly transfer or discharge from the facility." Further, as mentioned below in conjunction with the notice requirements, the facility must notify the resident of "[t]he effective date of transfer or discharge" (subd. (a)(6)(ii)) and "[t]he location to which the resident is transferred or discharged" (subd. (a)(6)(iii)).

---

"(v) The resident has failed, after reasonable and appropriate notice, to pay for (or to have paid under Medicare or Medicaid) a stay at the facility. For a resident who becomes eligible for Medicaid after admission to a facility, the facility may charge a resident only allowable charges under Medicaid; or

"(vi) The facility ceases to operate."

5. *Notice* of *State Bed-hold Policy and Readmission*

Section 483.12 has several notice provisions applicable to transfers and discharges. We mention only some as potentially relevant to our issue.

Under subdivision (a)(4): "Before a facility transfers or discharges a resident, the facility must – [¶] (i) Notify the resident and, if known, a family member or legal representative of the resident of the transfer or discharge and the reasons for the move in writing and in a language and manner they understand. [¶] (ii) Record the reasons in the resident's clinical record; and [¶] (iii) Include in the notice the items described in paragraph (a)(6) of this section." The items in subdivision (a)(6) include "[t]he effective date of transfer or discharge" (subd. (a)(6)(ii)) and "[t]he location to which the resident is transferred or discharged" (subd. (a)(6)(iii)).[5]

Generally, this notice must be given at least 30 days before the transfer or discharge. (§ 483.12, subd. (a)(5).) However, under certain circumstances listed in subdivision (a)(5)(ii), such as when "the safety of individuals in the facility

---

[5]  Subdivision (a)(6) provides in full:

"(6) Contents of the notice. The written notice specified in paragraph (a)(4) of this section must include the following:

"(i) The reason for transfer or discharge;

"(ii) The effective date of transfer or discharge;

"(iii) The location to which the resident is transferred or discharged;

"(iv) A statement that the resident has the right to appeal the action to the State;

"(v) The name, address and telephone number of the State long term care ombudsman;

"(vi) For nursing facility residents with developmental disabilities, the mailing address and telephone number of the agency responsible for the protection and advocacy of developmentally disabled individuals established under Part C of the Developmental Disabilities Assistance and Bill of Rights Act; and

"(vii) For nursing facility residents who are mentally ill, the mailing address and telephone number of the agency responsible for the protection and advocacy of mentally ill individuals established under the Protection and Advocacy for Mentally Ill Individuals Act."

would be endangered" (§ 483.12, subd. (a)(5)(ii)(A)) the notice may be given "as soon as practicable before transfer or discharge." (§ 483.12, subd. (a)(5)(ii).)

Subdivision (b)(1) provides an additional pre-transfer notice requirement, applicable when "a nursing facility transfers a resident to a hospital or allows a resident to go on therapeutic leave." That notice "must provide written information to the resident and a family member or legal representative that specifies – [¶] (i) The duration of the bed-hold policy under the State plan, if any, during which the resident is permitted to return and resume residence in the nursing facility; and [¶] (ii) The nursing facility's policies regarding bed-hold periods, which must be consistent with paragraph (b)(3) of this section, permitting a resident to return." (§ 483.12, subd. (b)(1).)

Finally for our purposes, when a facility transfers a resident, subdivision (b)(2) of section 483.12 provides the notice requirement that must occur at the time of transfer. It provides: "At the time of transfer of a resident for hospitalization or therapeutic leave, a nursing facility must provide to the resident and a family member or legal representative written notice which specifies the duration of the bed-hold policy described in paragraph (b)(1) of this section." The reference to "paragraph (b)(1) of this section" refers to subdivision (b)(1)(i), "[t]he duration of the bed-hold policy under the State plan, if any, during which the resident is permitted to return and resume residence in the nursing facility."

### 6. *California Bed-Hold Policy*

California's bed-hold policy is contained in section 72520, which provides, as here relevant: "If a patient of a skilled nursing facility is transferred to a general acute care hospital as defined in Section 1250(a) of the Health and Safety Code, the skilled nursing facility shall afford the patient a bed hold of seven (7) days,

which may be exercised by the patient or the patient's representative." (§ 72520, subd. (a).)[6]

### 7. *Return after Transfer*

When the state bed-hold period has expired, section 483.12, subdivision (b)(3) provides a transferred resident with a right to return to the facility, to the next available bed. It states: "Permitting resident to return to facility. A nursing facility must establish and follow a written policy under which a resident, whose hospitalization or therapeutic leave exceeds the bed-hold period under the State plan, is readmitted to the facility immediately upon the first availability of a bed in a semi-private room if the resident – [¶] (i) Requires the services provided by the facility; and [¶] (ii) Is eligible for Medicaid nursing facility services."

### 8. *Refusal to Re-admit*

After a transfer for treatment in an acute care hospital, if a facility refuses to re-admit a resident under section 483.12, subdivision (b)(3), the refusal is tantamount to an involuntary transfer. Health and Safety Code section 1599.1, subdivision (h) provides in relevant part: "(h)(1) If a resident of a long-term

---

[6] Like section 483.12, section 72520 also has a notice provision, which requires that "upon transfer of the patient of a skilled nursing facility to a general acute care hospital, the skilled nursing facility shall inform the patient, or the patient's representative, in writing of the right to exercise this bed hold provision." (§ 72520, subd. (b).) A skilled nursing home that "fails to meet these requirements shall offer to the patient the next available bed appropriate for the patient's needs," and "[t]his requirement shall be in addition to any other remedies provided by law." (§ 72520, subd. (c).) However, "[i]f the patient's attending physician notifies the skilled nursing facility in writing that the patient's stay in the general acute care hospital is expected to exceed seven (7) days, the skilled nursing facility shall not be required to maintain the bed hold." (§ 72520, subd. (a)(3).)

health care facility has been hospitalized in an acute care hospital and asserts his or her rights to readmission pursuant to bed hold provisions, or readmission rights of either state or federal law, and the facility refuses to readmit him or her, the resident may appeal the facility's refusal. [¶] (2) The refusal of the facility as described in this subdivision shall be treated as if it were an involuntary transfer under federal law, and the rights and procedures that apply to appeals of transfers and discharges of nursing facility residents shall apply to the resident's appeal under this subdivision."

9. *Summary*

As relevant to the issue we are deciding, the plain meaning of these provisions makes clear that when a skilled nursing facility involuntarily transfers or discharges a resident because of circumstances described in section 483.12, subdivision (a)(2)(i) (for the resident's welfare and whose needs the facility cannot meet) or subdivision (a)(2)(iii) (for the safety of persons at the facility), the following requirements apply. First, the facility must identify the appropriate reason for transfer or discharge as specified in section 483.12, subdivision (a)(2). Second, it must comply with the documentation requirements of section 483.12, subdivision (a)(3). Third, as applicable to the case, it must comply with the notice provisions of section 483.12, subdivisions (a)(4), (a)(5), (a)(6), (b)(1), and (b)(2). Fourth, it must provide the resident with "sufficient preparation and orientation . . . to ensure a safe and orderly transfer or discharge from the facility" as required by section 483.12, subdivisions (a)(7), including giving notice of the effective date of the transfer or discharge and the location to which the resident will be transferred or discharged (subds. (a)(6)(ii) and (iii)). Fifth, it must follow a written policy consistent with section 483.12, subdivision (b)(3), under which a resident who was

18

transferred for "hospitalization or therapeutic leave" is readmitted to the first available bed if the State bed-hold period (in California, a 7-day bed-hold period (§ 72520)) has expired, and if the resident requires the services provided by the facility and is Medicaid eligible. Finally, a refusal to readmit is "treated as if it were an involuntary transfer under federal law" (§ 1599.1, subd. (h)(2)), meaning that absent compliance with the applicable involuntary transfer requirements under section 483.12, the refusal to readmit is improper.

B. *St. John's Contention*

St. John contends that it was not bound by section 483.12 (in particular, the requirements of notice before or at the time of that transfer, the bed-hold period, readmission after the State bed-hold period expire, and transfer planning). The reason: Ms. Woods' hospice care provider, St. Liz, ordered her transfer to the Hospital, rather than St. John.

As best we understand it, St. John's logic is as follows. The language of section 483.12 provides that the justification for an involuntary transfer under subdivision (a)(2) and the documentation required under subdivision (a)(3) apply only if the facility "transfers" the resident.[7] Thus, St. John asserts, the other section 483.12 requirements also apply only if the facility "transfers" the resident.

---

[7] See subdivision (a)(2) ["[t]he facility must permit each resident to remain in the facility, and not transfer or discharge the resident from the facility unless" one or more of the listed circumstances are met]; subdivision (a)(3) [documentation of the reason for transfer or discharge must be made "[w]hen the facility transfers or discharges a resident" under circumstances described in subdivision (a)(2)].

Although Ms. Woods resided at St. John, she had elected St. Liz as her hospice provider under 42 Code of Federal Regulations section 418.24, subdivision (a).[8] Further, as required by 42 Code of Federal Regulations section 418.112, subdivision (b), St. Liz had "assume[d] responsibility for professional management of the resident's hospice services provided, in accordance with the hospice plan of care and the hospice conditions of participation."  As such, it was Ms. Woods attending physician, acting for St. Liz (as opposed to St. John), who determined that Ms. Woods should be transferred from St. John to the Hospital for a psychiatric evaluation and treatment.  Therefore, St. John argues, it did not "transfer" Ms. Woods.  Rather, St. Liz did.  Further, according to St. John, it was not obligated to comply with section 483.12, including the duty to readmit her.

We disagree.  There is no doubt that Ms. Woods' relocation from St. John to the Hospital was a transfer under section 483.12, subdivision (a)(1) – it was a "movement of a resident to a bed outside of the certified facility."  St. John asserts that St. Liz was responsible for the transfer, but St. John does not state, or even imply, that St. Liz was responsible for complying with the requirements of section 483.12.  The reason is obvious.  St. Liz was not the skilled nursing facility where Ms. Woods resided, and thus St. Liz was not covered by section 483.12.  Under St. John's logic, section 483.12 simply did not apply.

But that result violates the plain meaning of section 483.12 as a whole and common sense.  Section 483.12 expressly refers to the obligations the facility bears

---

[8] 42 Code of Federal Regulations section 418.24, subdivision (a)(1)  provides:  "An individual who meets the eligibility requirement of § 418.20 may file an election statement with a particular hospice.  If the individual is physically or mentally incapacitated, his or her representative (as defined in § 418.3) may file the election statement."  An individual is qualified to file a hospice election if the person is entitled to Medicare Part A and is certified as being terminally ill.  (42 C.F.R. § 418.20, subds. (a) & (b).)

to a "resident," and does not contain any suggestion that if the resident is under the care of a hospice provider, the involuntary transfer provisions do not apply. Indeed, that result makes no sense. Surely, given that a terminally ill resident at a skilled nursing facility is authorized to elect hospice care, and that the skilled nursing facility is authorized to contract with hospice care providers to provide such care at the facility, federal regulations would not deprive such a resident of the protections of section 483.12 simply based on whose employee – the hospice's or the facility's – determines the need for a transfer. And if that were the intent, we presume that the regulations would so state. Thus, we decline to read into section 483.12 any exemption that applies solely because a resident's hospice care provider determines the need for an acute care hospitalization rather than the long term care facility.

St. John summarily asserts, without explanation, that if it had prepared a discharge plan in connection with its refusal to readmit Ms. Woods, it would have violated both its contract with St. Liz and 42 Code of Federal Regulations section 418.112, subdivision (c)(3), which provides that a skilled nursing facility such as St. John "must have a written agreement that specifies the provision of hospice services in the facility" including "[a] provision stating that the hospice assumes responsibility for determining the appropriate course of hospice care, including the determination to change the level of services provided."

But St. John fails to explain the purported conflict. Section 483.12 required St. John to identify a justifying circumstance for refusing to re-admit Ms. Woods under subdivision (a)(2), to document it under subdivision (a)(3), and to provide preparation and orientation for a safe and orderly transfer under subdivision (a)(7), including determining the effective date of transfer or discharge and the location to which Ms. Woods would be sent (subds. (a)(6)(i) and (ii)). Certainly St. John, as

21

the facility in which Ms. Woods resided, could comply with these duties in consultation with St. Liz, without purporting to dictate the appropriate course of hospice care or level of service provided. Indeed, several provisions of 42 Code of Federal Regulations section 418.112 contemplate such cooperation. (See 42 Code of Fed. Regs., § 418.112, subd. (c)(1) [skilled nursing facility's written agreement with hospice service must explain "[t]he manner in which the SNF/NF [skilled nursing facility or nursing facility] and the hospice are to communicate with each other and document such communications to ensure that the needs of patients are addressed and met 24 hours a day"]; *id.,* subd. (c)(2) [agreement must require the skilled nursing facility to "immediately notif[y] the hospice if – [¶] (i) A significant change in a patient's physical, mental, social, or emotional status occurs; [¶] (ii) Clinical complications appear that suggest a need to alter the plan of care; [or] [¶] (iii) A need to transfer a patient from the SNF/NF . . . , and the hospice makes arrangements for, and remains responsible for, any necessary continuous care or inpatient care necessary related to the terminal illness and related conditions"]; *id.* subd. (c)(4) [agreement must require the skilled nursing facility "to continue to furnish 24 hour room and board care, meeting the personal care and nursing needs that would have been provided by the primary caregiver at home at the same level of care provided before hospice care was elected"].) Thus, we see no conflict between, on the one hand, St. John's duty to perform discharge planning under section 483.12, and, on the other hand, either the requirements of 42 Code of Federal Regulations section 418.112, subdivision (c)(4), or St. John's contract with St. Liz.

St. John also contends that if it readmitted Ms. Woods, and then complied with the requirements of section 483.12 to transfer or discharge her, including preparation of a discharge plan, it would have violated Health and Safety Code

22

section 1432 (section 1432).  That statute prohibits a long term care facility from discriminating or retaliating against any "complainant or . . . patient . . . on the basis or for the reason that the complainant, patient, . . . or any other person has presented a grievance or complaint, or has initiated or cooperated in any investigation or proceeding of any governmental entity relating to care, services, or conditions at that facility.  A licensee who violates this section is subject to a civil penalty of no more than ten thousand dollars ($10,000), to be assessed by the director and collected in the manner provided in Section 1430."  (§ 1432, subd. (a).)

St. John's contention that it would violate section 1432, subdivision (a) by readmitting Ms. Woods and planning her discharge is based on the presumption created by section 1432, subdivision (b), which provides:  "Any attempt to expel a patient from a long-term health care facility, or any type of discriminatory treatment of a patient by whom, or upon whose behalf, a grievance or complaint has been submitted, directly or indirectly, to any governmental entity or received by a long-term health care facility administrator or any proceeding instituted under or related to this chapter *within 180 days of the filing of the complaint or the institution of the action*, shall raise a *rebuttable presumption* that the action was taken by the licensee in retaliation for the filing of the complaint."  (Italics added.)

Although St. John does not fully develop the argument, it appears that St. John is contending that if it had readmitted Ms. Woods, complied with the discharge requirements of section 483.12, and then discharged Ms. Woods, all within 180 days of the ombudsman's complaint, it would be presumed to be in violation of section 1432, subdivision (a).  However, the presumption of section 1432, subdivision (b) is one "affecting the burden of producing evidence as provided in Section 603 of the Evidence Code."  (§ 1432, subd. (d).)  The effect of

23

such a presumption is that "when the party against whom such a presumption operates produces some quantum of evidence casting doubt on the truth of the presumed fact, the other party is no longer aided by the presumption. The presumption disappears, leaving it to the party in whose favor it initially worked to prove the fact in question." (*Rancho Santa Fe Pharmacy, Inc. v. Seyfert* (1990) 219 Cal.App.3d 875, 882.)

Thus, St. John's concern about being found in violation of section 1432 is unfounded. Obviously, if St. John complied with the requirements of a discharge under section 483.12, and thereafter discharged Ms. Woods, that evidence would show that St. John was not discriminating or retaliating against her, but rather complying with the nondiscriminatory and non-retaliatory discharge requirements of section 483.12. Thus, the presumption affecting the burden of proof under section 1432, subdivision (b) would disappear. In short, it is inconceivable that that St. John would have been in violation of section 1432 had it readmitted Ms. Woods and validly complied with section 483.12 in later discharging her.

Thus, for all of the foregoing reasons, we conclude that section 483.12 does not exempt a skilled nursing facility from the readmission requirement (483.12, subd. (b)(3)) solely because the transfer to an acute care hospital from which the resident is returning was ordered by the resident's hospice care provider rather than the facility itself. To the extent St. John contends that its refusal to readmit Ms. Woods did not constitute an involuntary transfer because she was returning from an acute hospitalization ordered by St. Liz, St. John is mistaken. Further, that St. Liz ordered the acute hospitalization also did not exempt St. John from complying with the involuntary transfer provisions of section 483.12, subdivision (a)(2) (requiring identification of a justifying circumstance), subdivision (a)(3) (requiring documentation of the justifying circumstance) and subdivision (a)(7) (requiring

24

preparation and orientation for a safe and orderly transfer), including giving notice of the effective date of the transfer or discharge and the new resident location (subds. (a)(6)(ii) and (iii)), before terminating Ms. Woods' residency.  Finally, there was no risk that readmitting Ms. Woods and later discharging her in compliance with section 483.12 would have placed St. John in violation of section 1432.

## DISPOSITION

The order denying the petition for writ of administrative mandate is reversed solely on the ground that the DHCS order for Ms. Woods' readmission to St. John is moot.  (See *Giles, supra*, 100 Cal.App.4th at p. 229.)  We remand the matter to the superior court, with directions to dismiss the petition for writ of administrative mandate as moot.  Each side shall bear its own costs on appeal.

**CERTIFIED FOR PUBLICATION**


WILLHITE, J.


We concur:


EPSTEIN, P. J.                    COLLINS, J.


25