Filed 8/26/25

**CERTIFIED FOR PUBLICATION**

APPELLATE DIVISION OF THE SUPERIOR COURT

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

| | | |
|---|---|---|
| THE PEOPLE, | ) | 24APCM00097 |
| | ) | |
| Plaintiff and Appellant, | ) | Clara Shortridge Foltz Criminal Justice Center Trial Court |
| v. | ) | |
| | ) | No. 3CJ06574-01,02 |
| GIUSEPPE JOHN FERRIGNO et al., | ) | |
| | ) | |
| Defendants and Respondents. | ) | **OPINION** |
| | ) | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert C. Vanderet, Judge. Affirmed.

Hydee Feldstein Soto, City Attorney, City of Los Angeles, Dennis Kong, Head Deputy City Attorney, Meredith McKittrick, Assistant Head Deputy City Attorney, Rita Patel and John R. Prosser, Deputy City Attorneys, for Plaintiff and Appellant.

Ronald A. McIntire, Perkins Coie LLP, and Howard R. Price, for Defendants and Respondents.

\* \* \*

1

As succinctly summarized by the trial court, "At the heart of this case is the intersection of two compelling state interests: The conservation and protection of diverse fish species, and the promotion of California's commercial fishing industry."

Defendants Giuseppe John Ferrigno and Benito Caserma were charged with violating California Fish and Game Code (FGC) section 2002, based on their possession of fish taken in violation of a regulation adopted pursuant to the FGC, namely California Code of Regulations, title 14, section 150.16, subdivision (a) (150.16(a)), barring capturing California scorpionfish shorter than 10 inches in length. The trial court dismissed the charge, determining 150.16(a) was not intended to apply to "bycatch" (FGC, § 90.5 ["fish or other marine life that are taken in a fishery but which are not the target of the fishery"]) netted during a commercial squid fishing operation, and the People appeal the dismissal. As discussed below, we draw the same conclusion as the trial court, and affirm.

## BACKGROUND

A supplemental investigation report, which was prepared by agents of the California Department of Fish and Wildlife (Department) and was provided to the trial court by defense counsel in support of dismissing the charges, includes a useful backdrop.

> The commercial take of market squid . . . is one of the most lucrative fisheries in California. The squid are harvested by large permitted commercial seine vessels, which use a seine net to capture up to 100 tons of the nocturnal squid during a night's fishing efforts.

> The squid are attracted to the surface by a permitted light boat, a support vessel which has several high-powered lights that are directed toward the ocean's surface. Once attracted to the surface, the squid school in a tight aggregate referred to as a "float."

> After the squid are aggregated, one end of the seine net is deployed from the seine vessel using a small support vessel referred to as a power skiff. The power skiff pulls the net in a wide circle around the light boat and the aggregate of squid, while the other end of the net is still attached to the seine vessel. The power skiff then returns its end of the net to the seine vessel. The net is now deployed in a large circle around the squid. The seine vessel mechanically pulls in one end of the net and "purses" the aggregated squid until the net and squid are along the vessel's side.

> The vessel deploys a large suction device (a large vacuum). The suction end is placed into the captured squid, located in the ocean water along the side of the

2

vessel. The squid, and saltwater, are sucked from the net, down a sorting shaft into the vessel's fish hold . . . . Once the fishing efforts conclude, the vessel returns to port to offload the squid to a land-based squid processor.

The land-based squid processors use a large suction device (another vacuum) to remove the squid from the vessel's hold. . . . The squid and remaining water are then "vacuumed" from the vessel's hold and are moved down a large pipe to be weighed. . . . The squid continue to be moved to a mechanical device . . . that weighs the squid and then directs them into bins to be to be transported to a land-based facility to be processed.

Another investigation report, also provided to the court, documented how Department wardens on May 19, 2022, at approximately 9:30 a.m. in San Pedro in Los Angeles County, saw the commercial purse seine vessel Barbara H moored to a commercial offloading dock specializing in the processing of bait fish. During a compliance inspection of the dock facility, the wardens noted squid caught that day by the boat (14,740 lbs.) had already been processed and moved away, and they examined plastic bins containing bycatch confirmed by Caserma, the production manager, to have come from Barbara H's haul. The wardens were informed employees pull the bycatch from the mechanical conveyor belt as the squid are moved through the facility, and the employees are allowed to keep the fish for personal consumption.

The bycatch included 17 scorpionfish, each measuring less than 10 inches in length, along with sanddabs, sea cucumbers, skates and rays. Caserma, along with Ferrigno, the boat's captain, were issued notices to appear for violations based on possession of the undersized scorpionfish.

TRIAL COURT PROCEEDINGS

The operative charge dismissed by the court was filed by way of a May 4, 2023 amended complaint alleging defendants violated FGC section 2002.[1] On August 10, 2023, defendants filed a demurrer, which was overruled, and on January 10, 2024, they entered not guilty pleas at arraignment.

On May 15, 2024, the day prior to when trial was scheduled to start, defense counsel argued to the court the prosecutor would be unable to establish a violation of FGC section

_____

[1]Additional charges in the amended complaint were dismissed at the prosecutor's request such that only a single FGC section 2002 offense was alleged.

3

2002, because the scorpionfish were not taken in an illegal manner. Counsel maintained the regulation the People alleged was violated—150.16(a)—applied only to activity within the Department's Nearshore Fishery Management Plan (Nearshore Fishery Plan), not to defendants' conduct involving commercial squid fishing, which was regulated by the Department's Market Squid Fishery Management Plan (Market Squid Plan). The prosecutor responded the regulation applied to defendants, because they were "out in a nearshore fishery fishing." The court indicated it needed time to examine memoranda filed by the attorneys in favor and against dismissal, and continued the case. On May 23, 2024, the court noted it "circulated a proposed dismissal," and after considering further arguments from defense counsel and the prosecutor, proceeded to dismiss the case under Penal Code section 1385.

In a written order, the court explained the reasoning for its ruling. The court began by noting the "two compelling state interests" that were "[a]t the heart of this case," as indicated above, and stated it took judicial notice as follows. "California [s]corpionfish are a venomous bottom-dwelling fish, which can live up to 21 years, and which are found along the California coast from Santa Cruz to the Mexican border, most prevalently in Southern California. They are largely a recreational fishing target, with minimal intentional commercial fishing. As of 2017, they were not considered to be overfished. In 2011, approximately $201 million dollars in ex-vessel revenue (the amount paid directly to fishermen) came from commercial fishery landings, and more than 120,000 jobs on and off the water were supported by the state's seafood industry."

The court found the Department issued regulations with management plans for six distinct fisheries, including the Nearshore Fishery Plan and the Market Squid Plan. The court also noted the prosecutor argued 150.16(a) applied even though it was a regulation adopted as part of the Nearshore Fishery Plan, because scorpionfish are included in the definition of "nearshore fish." But, the court determined 150.16(a) was not intended to apply to bycatch of commercial squid fishermen, who are governed by the Market Squid Plan.

The court relied on portions of the Market Squid Plan and a report by the Department in its Marine Species Portal as indicating 150.16(a) was inapplicable. "First, the Department [in the Market Squid Plan] expressly recognizes that 'Bycatch is minimal in the commercial

4

market squid fishery, although it cannot be avoided entirely' . . . . Second, the Department [in its Marine Species Portal] notes that, 'Because pumping at sea is so common, any incidental catch of small fish would not be sorted at sea.'" According to the court, "These provisions demonstrate that the Department . . . recognizes that bycatch will occur. It also recognizes that it is not possible to sort the catch at sea and dispose of small fish, such as undersized scorpionfish, at sea."

The court concluded, "By the adoption of its voluminous and comprehensive [Market Squid Plan], the Department . . . has unquestionably acted in its delegated quasi-legislative capacity, and the provisions therein appear to the court to be reasonably necessary to implement the purposes of the statute. Accordingly, this court's judicial review of the Plan is over. The undersized scorpionfish taken as a bycatch by defendants is not a taking in violation of governing regulations."

On June 3, 2024, the People filed a timely notice of appeal from the court's order of dismissal.[2]

## DISCUSSION

Standard of Review and the Issue Presented

Penal Code section 1385, subdivision (a), provides, in relevant part, "The judge or magistrate may, either on motion of the court or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed." A dismissal under this section may be entered "before, during [or] after trial." (*People v. Orin* (1975) 13 Cal.3d 937, 946.) A trial court has the authority to dismiss a charge under the statute based on the insufficiency of the evidence (see *People v. Hatch* (2000) 22 Cal.4th 260, 269) or inapplicability of a statute (see, e.g., *People v. Tirado* (2022) 12 Cal.5th 688, 692 [courts may

---

[2]This court has jurisdiction to hear the appeal, because under Penal Code section 1466, subdivision (a)(2), the trial court's dismissal was "an order . . . dismissing . . . the action . . . entered before the defendant has been placed in jeopardy." (See *In re Mendes* (1979) 23 Cal.3d 847, 850 [jeopardy does not attach prior to a jury having been selected and sworn], superseded by statute on another ground as stated in *People v. Cottle* (2006) 39 Cal.4th 246, 253-254; see also *People v. Chacon* (2007) 40 Cal.4th 558, 564 ["the prosecution may appeal the dismissal, and, as part of the appeal, challenge the underlying ruling[s]"].)

strike certain sentencing enhancements "in the interests of justice under the authority of [Penal Code] section 1385"]).

"On appeal, a reviewing court typically asks whether dismissal was an abuse of discretion.  [Citations.]  But the interpretation of a statute remains a question of law subject to de novo review.  [Citation.]"  (*Wheeler v. Appellate Division of Superior Court* (2024) 15 Cal.5th 1193, 1206.)  De novo review is also appropriate given the trial court applied laws and regulations to undisputed facts.  (*People v. Shaginyan* (2025) 109 Cal.App.5th Supp. 1, 8.)

""""Under settled canons of statutory construction, in construing a statute we ascertain the Legislature's intent in order to effectuate the law's purpose.  [Citation.]""""  (*People v. Lucero* (2019) 41 Cal.App.5th 370, 394-395.)  "[T]he court's first step in statutory construction is to 'look to the words themselves, giving them their ordinary meanings and construing them in context.'  [Citation.]"  (*People v. Salas* (2017) 9 Cal.App.5th 736, 742.)  When a statute is ambiguous, we can consult legislative history and other extrinsic aids to ascertain its meaning.  (*People v. Gonzalez* (2008) 43 Cal.4th 1118, 1126.)

The same principles apply to interpretation of regulations promulgated by agencies.  (See *St. John of God Retirement & Care Center v. State Dept. of Health Care Services* (2016) 2 Cal.App.5th 638, 649.)  "Our foremost aim is to ascertain the intent of the agency issuing the regulation to effectuate the purpose of the law.  [Citations.]  When the agency's intent cannot be discerned directly from the language of the regulation, we may look to a variety of extrinsic aids, including the purpose of the regulation, the legislative history, public policy, and the regulatory scheme of which the regulation is a part.  [Citation.]  Whenever possible, we will interpret the regulation to make it workable and reasonable.  [Citation.]"  (*Manriquez v. Gourley* (2003) 105 Cal.App.4th 1227, 1235.)

FGC section 2002 states, "It is unlawful to possess a bird, mammal, fish, reptile, amphibian, or part of any of those animals, taken in violation of this code or a regulation adopted pursuant to this code."  Violation of the section constitutes a misdemeanor, punishable with up to six months in jail and/or a $1,000 fine.  (FGC, §§ 12000, subd. (a), 12002, subd. (a); Pen. Code, § 19.)

Under the statute's plain terms, three elements of FGC section 2002 are set forth:

(1) A person must "possess" the animal or any part of the animal; (2) the animal or any part of the animal must be "taken"; and (3) the taking must violate the FGC or a regulation adopted pursuant to the FGC.

Possession is uncontested, as the scorpionfish found in the plastic bins came from the seine purser Barbara H, and defendants did not dispute they constructively possessed the fish given their positions of authority in the squid fishing enterprise. The fish were "taken," as FGC section 86 provides "'[t]ake' means hunt, pursue, catch, capture, or kill, or attempt to hunt, pursue, catch, capture, or kill," and the scorpionfish were caught or captured while defendants' vessel was squid fishing. The only question is whether the Legislature intended 150.16(a), barring the capture of California scorpionfish shorter than 10 inches in length, to apply to defendant's conduct—commercial squid fishing. An examination of the regulatory scheme shows application of this section to scorpionfish bycatch of commercial squid fishing was not intended.

<u>Statutory and Regulatory Provisions Indicative of Intent</u>

*Origins of regulations*

In 1998, the Legislature enacted FGC section 7070, declaring "the critical need to conserve, utilize, and manage the state's marine fish resources and to meet the policies and other requirements stated in this part [which would] require that the state's fisheries be managed by means of fishery management plans." The plans were to constitute "the primary basis for managing California's sport and commercial marine fisheries," and were to "be based on the best scientific information that is available, on other relevant information that the department possesses, or on the scientific information or other relevant information that can be obtained without substantially delaying the preparation of the plan." (FGC, § 7072, subds. (a) & (b).)

FGC section 7075, subdivision (a), conferred on the Department the power to create the fishery plans and to recommend adoption of implementing regulations by the Fish and Game

Commission.[3]  The statute indicates, "The [D]epartment shall prepare fishery management plans and plan amendments, including any proposed regulations necessary to implement plans or plan amendments, to be submitted to the commission for adoption or rejection."  (FGC, § 7075, subd. (a).)

Six plans were promulgated: a White Seabass Fishery Management Plan (Cal. Code Regs., tit. 14, div. 1, subd. 1, ch. 5.5, art. 2); the Nearshore Fishery Plan (*id.*, art. 3); the Market Squid Plan (*id.*, art. 4); a California Spiny Lobster Fishery Management Plan (*id.*, art. 5); a California Pacific Herring Fishery Management Plan (*id.*, art. 6); and a Pink (Ocean) Shrimp Fishery Management Plan (*id.*, art. 7).  Each plan has its own enabling statute.  (See, e.g., FGC, §§ 8425 [Market Squid Plan enabling law], 8587.1 [Nearshore Fishery Plan enabling statute].)

To understand why 150.16(a) was not intended to apply to commercial squid fishing, it is useful to look at the regulations adopted pursuant to the Nearshore Fishery Plan, and to examine the Department's assessment in the Market Squid Plan and Marine Species Portal. Our review provides valuable insight on the intent of the Department in adopting the regulation.

*The Nearshore Fishery Plan Regulations and the Market Squid Plan/Marine Species Portal*

The picture revealed tells the tale of two fisheries.  The distinction between nearshore and commercial squid fishing powerfully points to an intent to not apply the 150.16(a) nearshore fishing regulation to the latter enterprise.

"'Nearshore fisheries' means the commercial or recreational taking, possession, or landing of any species of nearshore fish stocks."  (Cal. Code Regs., tit. 14, § 1.90, subd. (c).) Regulations adopted to implement the Nearshore Fishing Plan indicate "dip nets" and specified "hook-and-line gear" are used in nearshore fishing.  (See Cal. Code Regs., tit. 14, § 150, subd. (l).)  A dip net consists of "[w]ebbing supported by a frame, and hand held, not more than six feet in greatest dimension, excluding handle."  (*Id.*, § 1.42.)  Hook-and-line gear allowed

---

[3]At the time the legislation was enacted, the Department was known as the Department of Fish and Game, but "[e]ffective January 1, 2013, the Department of Fish and Game was renamed the Department of Fish and Wildlife.  ([FGC], § 37.)"  (*Coastside Fishing Club v. California Fish & Game Com.* (2013) 215 Cal.App.4th 397, 405, fn. 2.)

generally can consist of no more than "150 hooks on a vessel" and "15 hooks per line," when used "to take nearshore fish stocks for commercial purposes in ocean waters." (*Id.*, § 150.17.) Also used are trap gear, which must be marked with buoys. (See *id.*, §§ 150.03, subd. (c), 180.5, subd. (a).)

Other Nearshore Fishery Plan regulations include requirements that permits be issued. (Cal. Code Regs., tit. 14, § 150.01.) Weight limits of hauls per designated months are also provided. (See, e.g., *id.*, § 150.16, subd. (e)(5) ["California Scorpionfish . . . 3,500 lbs / 2 mo," "Black rockfish . . . 7,000 lbs / 2 mo," etc.].)

The regulation alleged to be violated, 150.16(a), lists the size limits for nine types of fish, ranging from 10 to 15 inches, including the 10-inch limit for scorpionfish. The regulation further provides, "[N]earshore fish listed under this section that are taken in a nearshore fishery shall be measured immediately upon being brought aboard the vessel and released immediately if not in compliance with the size limits specified." (*Id.*, § 150.16, subd. (c).)

The Market Squid Plan considered by the trial court in the appellate record is also found online. (See Final Market Squid Fishery Management Plan, <https://nrm.dfg.ca.gov/ FileHandler.ashx?DocumentID=33570&inline> [as of Aug. 18, 2025].) The plan "establishes a management program for California's market squid resource and procedures by which the [California Fish and Game] Commission will manage the market squid fishery." (*Id.*, Notice.) "The goals of the [Market Squid Plan] are to manage the market squid resource to ensure long term resource conservation and sustainability, and to develop a framework for management that will be responsive to environmental and socioeconomic changes." (*Id.*, § 1, pp. 1-i-1-ii.)

The plan indicates, "Commercial landings of market squid in California increased almost 400% from the 1990-1991 to the 1997-1998 season," and "[c]oncern over the rapid increase in squid harvest and new vessels entering the fishery from other states led to industry sponsored legislation." (Final Market Squid Fishery Management Plan, *supra*, ch. 1, p. 1-1.) Included objectives of the plan are to "[p]rovide for the sustainable use of the market squid resource by commercial and recreational fisheries for the optimum long-term benefits of present and future generations," "[m]aintain an adequate forage reserve for marine mammals, fish and seabirds," "[u]se adaptive management to provide for necessary changes and modifications of

9

management measures in a timely and efficient manner," "[e]nsure proper utilization, the avoidance of bycatch in the market squid fishery, and the avoidance of wastage of market squid in other fisheries," and "[e]nsure enforcement of regulations." (*Id.*, ch. 1, p. 1-5.)

Regarding bycatch, as observed by the trial court, the Market Squid Plan states, "Bycatch is minimal in the commercial market squid fishery, although it cannot be avoided entirely." (Final Market Squid Fishery Management Plan, *supra*, ch. 1, p. 1-40.) The plan explains, "[P]urse seines used for squid typically do not hang as deep as purse seines used for other species, so contact with the bottom is reduced," and notes, "Less than 2 percent of the observed landings contained species that are prohibited from being landed using seine gear (e.g., barracuda, yellowtail)." (*Id.*, p. 1-41.)[4]

Excerpts found in the Department's online Marine Species Portal, contained in a Market Squid Enhanced Status Report, were given to the trial court. (See Market Squid Enhanced Status Report, <https://marinespecies.wildlife.ca.gov/market-squid/management/> [as of Aug. 18, 2025].) The report elaborates on the scope of bycatch in the industry. "Round-haul fishing seldom results in unintentionally caught fish, primarily because the vessels target specific single-species schools [citation]. Incidental catch in the [Coastal Pelagic Species, CPS,] fishery is primarily other CPS (e.g., Pacific mackerel, Pacific sardine, or northern anchovy). If larger fish are in the net, they can be released alive before pumping or brailing by lowering a section of the cork-line or by using a dip net. Grates can be used to sort larger non-CPS from the catch [citation]. The load is pumped out of the hold at the dock, where the catch is weighed and incidentally caught fish can be observed and sorted." (*Id.*, § 3.1.3.2.) As the court noted, the Department stated, "Because pumping at-sea is so common, any incidental catch of small fish would not be sorted at-sea." (*Ibid.*) The report continued, "Most bycatch is caught when round haul nets fish in shallow water over rocky bottom [citation]. Operators try to avoid this to protect gear. Also, they may be specifically prohibited to fish these areas because of closures." (*Ibid.*)

Application to Case *Sub Judice*

---

[4]FGC, § 8623, subdivision (a), states, "It is unlawful to use any purse seine or round haul net to take yellowtail, barracuda, or white sea bass."

The People on appeal argue, "Nothing in the statute or regulation puts a limit on the applicability of [FGC] section 2002 nor of section 150.16 based on *who* does the taking or on *what* they were intending to take." (Italics in original.) We reject this interpretation.[5]

The text of 150.16(a) does not state it is confined to only recreational and commercial nearshore fishing, and does not exclude fish caught during a commercial fishing operation. But, there is ambiguity regarding 150.16(a).

The regulation is titled "Commercial Take of Nearshore Fishes," appearing to limit the regulation to the taking of nearshore fish for "commercial purposes" during a nearshore fishery business, as opposed to by way of bycatch while engaged in squid fishing. Further, 150.16(a) was included in a group of regulations meant to implement the Nearshore Fishery Plan (see Cal. Code Regs., tit. 14, § 52, subd. (a)), and the regulations state, in relevant part, "A regulation specific to commercial fishing for nearshore fish stocks is included with commercial fishing regulations in Chapter 6, beginning with Section 150" (*id.*, § 52, subd. (b)). Also, subdivision (c) of 150.16, provides that "[a]ny nearshore fish listed under this section [including scorpionfish] *that are taken in a nearshore fishery* shall be measured immediately upon being brought aboard the vessel and released immediately if not in compliance with the size limits specified." (Italics added.) The qualifier—"that are taken in a nearshore fishery"— injects additional uncertainty to application of 150.16(a), because if the reference is to a taking while working in a nearshore fishery business, it cannot be said 150.16(a) applies to commercial squid fishing.

The ambiguity is clarified by our review of the pertinent parts of the regulations adopted to implement the Nearshore Fishery Plan and the Market Squid Plan. (See *People v. Pieters*

---

[5]The trial court deferred to the Department's interpretation of 150.16(a), noting the Department "acted in its delegated quasi-legislative capacity" and that the court's "judicial review" was thus "over." (See *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12 (*Yamaha*).) It is unclear from the record whether 150.16(a) was promulgated through the Department's quasi-legislative authority, but, in any event, we review the trial court's ruling and not its rationale (*People v. Zapien* (1993) 4 Cal.4th 929, 976). We proceed to make our determination using the traditional rules for statutory and regulatory interpretation (*Manriquez v. Gourley*, *supra*, 105 Cal.App.4th at p. 1235), consulting the fishery plans to discern the regulation's intent without deferring to the Department. (See *Yamaha*, *supra*, 19 Cal.4th at p. 14 [even when not deferring to an agency's interpretation, the agency's "'body of experience and informed judgment'" may be consulted for guidance].)

(1991) 52 Cal. 3d 894, 899 ["we do not construe statutes in isolation, but rather read every statute 'with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness'"].)

The People maintain, "[E]ach fishery management plan focuses on the *fish* not *who* is doing the fishing or the[] fish they *intend* to take." (Italics in original.) Not so, as the scope and content of the regulations and plans comprehensively analyze the *activity* at issue: whether it be nearshore commercial or recreational fishing, or market squid fishing.[6]

The Nearshore Fishery Plan regulations deal with fishing techniques using comparatively small nets, and hooks and traps. (See Cal. Code Regs., tit. 14, §§ 1.42, 150, subd. (l), 150.17.) The Department could reasonably have found this type of fishing allows size limits to be implemented, because the fish can be measured "immediately upon being brought aboard the vessel and released immediately if not in compliance with the size limits specified." (*Id.*, § 150.16, subd. (c).)

The Market Squid Plan and excerpts from the Market Squid Enhanced Status Report in the Marine Species Portal make plain that commercial squid fishing does not lend itself to regulation based on the size of small fish captured as bycatch. "Bycatch is minimal in the commercial market squid fishery, although it cannot be avoided entirely." (Final Market Squid Fishery Plan, *supra*, ch. 1, p. 1-40.) Bycatch is noted to be less prevalent with commercial squid fishing, as "purse seines used for squid typically do not hang as deep as purse seines used for other species, so contact with the bottom is reduced." (*Id.*, p. 1-41.) The Department, in the Market Squid Enhanced Status Report, indicates that "[b]ecause pumping at-sea is so common, any incidental catch of small fish would not be sorted at-sea." (Market Squid Enhanced Status Report, *supra*, § 3.1.3.2.) The Department also notes, "If *larger* fish are in the net, they can be released alive before pumping or brailing" (*ibid.*), appearing to recognize the difficulty of scooping out of big nets small fish at sea.

---

[6]The People further assert, "[T]he enabling statutes for each [fishery management] plan restrict each plan to regulating only the type(s) of fish covered by each plan," but we see nothing in the enabling statutes at issue (FGC, §§ 8425, 8587.1) as revealing such a limited intent.

12

The Market Squid Plan sheds additional light on our interpretation of section 150.16(a), by noting there are specific provisions that bar capturing some types of fish by using seine gear, as practiced in commercial squid fishing.  (Final Market Squid Fishery Plan, *supra*, ch. 1, p. 1-41.)  FGC section 8623, subdivision (a), provides it is unlawful to use a purse seine or round haul net to take yellowtail, barracuda, or white seabass.  The Department could reasonably have determined that, given existing restrictions in FGC section 8623, subdivision (a), a further prohibition as to the capture of undersized scorpionfish bycatch in commercial squid fishing was not warranted.  (Cf., *Gikas v. Zolin* (1993) 6 Cal.4th 841, 852 ["*Expressio unius est exclusio alterius*.  The expression of some things in a statute necessarily means the exclusion of other things not expressed"].)

At the end of the analysis, we look to our duty to "interpret the regulation to make it workable and reasonable." (*Manriquez v. Gourley*, *supra*, 105 Cal.App.4th at p. 1235.) The inclusion of 150.16(a) within Nearshore Fishery Plan regulations, as well as the Market Squid Fishery Plan's and Market Squid Enhanced Status Report's assessments, point to a determination that making it a misdemeanor to capture undersized scorpionfish while vacuuming thousands of pounds of squid out of nets at sea at night would be unworkable and unreasonable.

## DISPOSITION

The order of dismissal is affirmed.

_____

Ricciardulli, J.

We concur:

_____                    _____

P. McKay, P. J.                                              Guillemet, J.

13